## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DANA JOHNSON**,

               Plaintiff,

               v.

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY**,

               Defendant.

Case No. 19-cv-3534 (CRC)

## <u>MEMORANDUM OPINION</u>

       For a six-month period in 2018, Plaintiff Dana Johnson, then a financial analyst with the Washington Metropolitan Area Transit Authority ("WMATA"), earned 10% less than a white, male co-worker. Johnson believes she was paid less because she is an African American woman. WMATA disagrees. It attributes the differential to the fact that Johnson's colleague had greater job responsibilities, and that his past union membership placed him on a higher salary trajectory. Because WMATA has proffered undisputed evidence supporting both explanations, it is entitled to summary judgment on Johnson's disparate pay claims under the Equal Pay Act and Title VII of the Civil Rights Act.

### I.    Background

       The following facts appear to be uncontested unless otherwise indicated. Dana Johnson began working for WMATA in October 2010. Def.'s Stmt. Material Facts ("SMF") ¶ 18 (citing Fletcher Decl. ¶ 12). Johnson started out as a Financial and Grants Analyst and in 2014 then became a Financial Officer. Id. ¶ 18; Pl.'s SMF ¶ 2. Neither position is covered by a union collective bargaining agreement. See Def.'s SMF ¶¶ 18–19 (citing Fletcher Decl. ¶¶ 12–13). WMATA divides non-union positions into six salary plan classifications corresponding to

various functional responsibilities, including, as relevant here, Engineering ("EG") and Business Operations ("BO"). Id. ¶ 12 (citing Fletcher Decl. ¶ 10). Johnson's Financial Officer position, which was later revised by her supervisors to Senior Financial Analyst, was classified at grade level BO-13. Pl.'s SMF ¶ 2; Garback Decl. ¶ 6; Garback Decl. Ex. A (Senior Financial Analyst position description).

Sometime in 2018, Johnson discovered that her salary was 10% lower than that of one of her co-workers, Aris Papapetrou. Pl.'s Cross-Mot. at 2. Despite their different titles and business areas—Papapetrou is a Project Coordinator with an Engineering salary classification— Johnson alleges that they performed substantially similar work. Id.; Pl.'s SMF ¶¶ 4, 7. The Court will return to the respective duties and responsibilities of the two positions below.

Papapetrou began his career at WMATA nearly two decades ago. Def.'s SMF ¶ 5 (citing Fletcher Decl. ¶ 3). At the beginning of his tenure, he joined a union—the Office and Professional Employees International Union, Local No. 2 ("Local 2"). Id. ¶¶ 5–6 (citing Fletcher Decl. ¶¶ 3–4). Under the collective bargaining agreement ("CBA") between Local 2 and WMATA, union members receive mandatory step increases based on their tenure and performance. Id. ¶ 8 (citing Fletcher Decl. Ex. A, at 29-32, App. A-E). Over his long career at WMATA, Papapetrou earned numerous step increases, and with each one came a bump in salary. Id. ¶¶ 9–10 (citing Fletcher Decl. ¶¶ 7-8).

On April 1, 2018, Papapetrou assumed his first non-union position at WMATA—with the title Project Coordinator—thereby ending his Local 2 membership. Def.'s SMF ¶ 6 (citing Fletcher Decl. ¶ 4). The position was classified as EG-13. Id. ¶ 13 (citing Fletcher Decl. ¶ 11). WMATA set Papapetrou's new salary by increasing his prior salary by 10%, resulting in annual pay of $133,764. Id. ¶ 22 (citing Fletcher Dep. 35:4–36:16; Fletcher Dep. Ex. 4). WMATA

asserts that the 10% increase was dictated by a provision of its employee compensation policy governing promotions.  Id.  More on that later.

Meanwhile, in March 2018, Johnson filed an official complaint requesting "a salary [and] position realignment," contending that her compensation was inconsistent with her job duties.  Fletcher Decl. ¶ 18 (citing id. Ex. C).  Johnson's supervisors reviewed her responsibilities, and ultimately revised her title to Senior Financial Analyst and adjusted her position description.  Def.'s SMF ¶ 28 (citing Fletcher Decl. ¶ 19; Garback Decl. ¶ 6).  WMATA's Office of Compensation and Benefits then determined "the appropriate salary grade level for the [revised] job description."  Id. ¶ 29 (citing Fletcher Decl. ¶ 20).  Despite her new title and position description, the Office left her grade and salary unchanged.  Id. ¶ 30 (citing Fletcher Decl. ¶ 21).  Soon thereafter, however, Johnson received a promotion to Program Manager in a different department, along with her own 10% salary increase, effective October 1, 2018.  Id. ¶ 38 (citing Johnson Dep. 42:12–43:20).

Johnson filed this lawsuit in November 2019.  She claims that the differential between her and Papapetrou's pay during the period in which she held the Financial Officer and Senior Financial Analyst positions and he held the Project Coordinator position—which spanned the six months between April 1, 2018 and October 1, 2018—resulted from unlawful gender discrimination in violation of the Equal Pay Act (Claim I) and gender and race discrimination in violation of Title VII of the Civil Rights Act of 1964 (Claims II and III).  The parties have completed discovery and now cross-move for summary judgment.

## II.    Standard of Review

A court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the "absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  At this stage, courts should view the evidence "in the light most favorable to the nonmoving party" and must "draw all reasonable inferences in favor of the nonmoving party."  Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (citation omitted); (Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006)).  Non-movants cannot rely on "mere allegations" or conclusory statements to defeat summary judgment.  Guillen-Perez v. District of Columbia, 415 F. Supp. 3d 50, 57 (D.D.C. 2019) (Cooper, J.) (citing Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006)).

On cross-motions for summary judgment, each party "must carry its own burden under the applicable legal standard."  Mitchell v. Pompeo, No. 1:15-CV-1849 (KBJ), 2019 WL 1440126, at *4 (D.D.C. Mar. 31, 2019) (quoting Ehrman v. United States, 429 F. Supp. 2d 61, 67 (D.D.C. 2006)).  A "cross-motion for summary judgment does not concede the factual assertions of the opposing motion."  Id. (citing CEI Washington Bureau, Inc. v. Dep't of Just., 469 F.3d 126, 129 (D.C. Cir. 2006)).

### III.   Analysis

Johnson brings two claims for pay discrimination, one under the Equal Pay Act, 29 U.S.C. § 206(d)(1), and the other under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).  The Court takes each in turn.

### A.  Equal Pay Act Claim

#### 1.  *Prima Facie Case*

The Equal Pay Act outlaws pay discrimination on the basis of sex, remedying the "ancient but outmoded belief that a man should be paid more than a woman for performing the same duties."  Perez v. D.C. Dep't of Emp. Servs., 305 F. Supp. 3d 51, 56 (D.D.C. 2018)

(cleaned up); 29 U.S.C. § 206(d)(1).  The Act prohibits an employer from paying an employee of

one sex a lower wage than it pays an employee of the opposite sex for "equal work on jobs the

performance of which requires equal skill, effort, and responsibility, and which are performed

under similar working conditions."  29 U.S.C. § 206(d)(1).  To establish an Equal Pay Act

violation, a plaintiff first must allege (and later prove) a prima facie case.[1]  "Once a prima facie

case has been made out, the defendant may rebut the showing of [job] equality, or assert one of

the Act's [four] affirmative defenses."  Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO, 815

F.2d 1519, 1523 (D.C. Cir. 1987).  These defenses allow wage disparities due to: "(i) a seniority

system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of

production; or (iv) a differential based on any other factor other than sex."  29 U.S.C.

§ 206(d)(1).[2]

---

[1] There is a degree of confusion in the caselaw as to the precise elements of a prima facie case under the Equal Pay Act.  In a recent case, Judge Moss of this court grappled with whether there are three elements—(1) unequal pay, (2) substantially equal work, and (3) substantially equal job requirements—or whether the third "equal job requirements" element defines, and therefore subsumes, the second "equal work" requirement.  Savignac v. Day, 539 F. Supp. 3d 107, 111–12 (D.D.C. 2021).  On reconsideration of an earlier ruling, Judge Moss landed on the latter interpretation based on his reading of the Supreme Court's decision in Corning Glass Works v. Brennan, 417 U.S. 188 (1974) and the D.C. Circuit's prior recitations of the elements. Savignac, 539 F. Supp. 3d at 111–15.  The Court generally concurs with Judge Moss's reasoning but need not delineate the elements of a prima facie case here because "equal job requirements" is undoubtedly one of them and, as will be discussed below, the dispute in this case centers on whether Johnson has established that element.

[2] Some circuit courts have added a third step to the analysis, permitting plaintiffs, like in the Title VII context, to show that the reason supporting the employer's affirmative defense was merely pretext for a sex-based pay disparity.  See, e.g., Belfi v. Prendergast, 191 F.3d 129, 136 (2d Cir. 1999).  At least one fellow court in this district has followed that approach.  See Franks v. Edison Elec. Inst., No. 20-CV-3393 (APM), 2022 WL 971157, at *3 (D.D.C. Mar. 31, 2022). Because the D.C. Circuit appears not to have endorsed this three-step approach, the Court will not adopt it here.  Rather, the Court will consider Johnson's pretext arguments in evaluating whether WMATA has met its burden to establish an affirmative defense at step two.

Johnson has not established a prima facie Equal Pay Act violation because she has not shown that she and Papapetrou held jobs requiring substantially "equal skill, effort, and responsibility." Goodrich, 815 F.2d at 1522. The "substantial equality" inquiry requires courts to consider not just selected aspects of the relevant jobs, but the positions in their totality; at the same time, courts focus on the "primary duties of each job, not those which are incidental or insubstantial." Id. at 1524 (citation omitted).

Johnson and Papapetrou's respective positions have different titles, are subject to different pay scales based on their distinct functional responsibilities, and have different overall requirements. During the relevant time period, Johnson was a Financial Officer and then a Senior Financial Analyst, supporting WMATA's fare-collection modernization program. Pl.'s Ex. G (WMATA Position Statement to EEOC at 3). As these titles suggest, the overall focus of Johnson's job was financial: "monitor[ing] departmental operating and capital program financial performance." Garback Decl. Ex. A (Senior Financial Analyst position description). Meanwhile, Papapetrou is a Project Coordinator, which has an Engineering salary classification. The overarching responsibility of that position is more operational: "assisting . . . in the planning, implementation and completion of highly complex[,] multi-discipline tasks related to managing the construction, rehabilitation, upgrade, or enhancement of [WMATA's] transit system." Garback Decl. Ex. B (Project Coordinator position description).

The jobs are also subject to different pay ranges. Employees in Johnson's grade BO-13 position can earn between $80,359 and $120,539 annually. Fletcher Decl. Ex. B (Chart of WMATA non-represented salary ranges). Those in Papapetrou's EG-13 position demand meaningfully higher salaries, from $94,824 to $142,236. Id. While the record is silent as to why the EG-13 position carries higher pay, simple economics would suggest that EG-13 employees,

on average, generally have either greater or scarcer skills, or more sophisticated job
responsibilities, than BO-13 employees.

The two positions also entail at least some distinct day-to-day duties and responsibilities.
Most relevant here, Project Coordinators have the authority to "review[] funding availability and
approve[] funding of change orders, supplemental agreements, and work orders involving capital
or operating reimbursable funds."  Garback Decl. Ex. B.  Such independent funding authority is
absent from the Senior Financial Analyst position description, and Johnson's supervisor confirms
that she "did not have authority to independently approve [WMATA] funding."  Garback Decl.
¶ 9.  Johnson does not contend otherwise.  And that authority is far from trivial; trusted financial-
related responsibilities like the power to commit an organization's funds is a major
distinguishing factor between any two jobs.  See Robinson v. Davis Mem'l Goodwill Indus.,
Inc., 846 F. Supp. 104, 107 (D.D.C. 1994) (finding that jobs were not "substantially equal"
where employer entrusted comparator with responsibility of pricing goods for auction, justifying
higher pay; 29 C.F.R. § 1620.17 (EEOC regulation noting that an employer would be allowed to
pay a higher wage to a sales clerk who is authorized to accept personal checks for payment than
to a sales clerk who was not tasked with that additional responsibility, "which may materially
affect the business operations of the employer").[3]

To be sure, a position description is not dispositive of what an employee's actual job
requires.  See, e.g., Savignac v. Day, 539 F. Supp. 3d 107, 118–19 (D.D.C. 2021) (citing
Brennan v. Prince William Hosp. Corp., 503 F.2d 282, 288 (4th Cir. 1974)).  But the two jobs

---

[3] WMATA also points to other seemingly important requirements of Papapetrou's
position that Johnson's job lacked, including independent authority to set budgets.  See Mot. at
9–10.  The Court need not address these additional differences, however, because Papapetrou's
funding approval authority is sufficient on its own to distinguish the two jobs.

here are not just different on paper.  The official who hired Papapetrou for the Project

Coordinator role attests that his official job description "accurately reflects the duties and

responsibilities required" of him—including approval of project funding.  Levy Decl. ¶ 5.  That

Papapetrou's job requires an important responsibility that Johnson's does not dooms her prima

facie case.  <u>Savignac</u>, 539 F. Supp. 3d at 112 ("For purposes of stating a prima facie case [under

the EPA] . . . the question is . . . what the job requires"); <u>see also</u> <u>Goodrich</u>, 815 F.2d at 1525

(holding that positions were not substantially equal because comparators' additional duties were

significant to employer's operation); <u>Johnson v. District of Columbia</u>, 947 F. Supp. 2d 123, 131

(D.D.C. 2013) (finding that jobs were not substantially equal because comparator held

"additional and significantly different duties").

  Johnson's efforts to avoid this result center on a declaration that Papapetrou submitted on

her behalf.  In it, he lists a series of tasks that are "included" within his primary duties.

Papapetrou Decl. ¶ 4.  The list largely overlaps with Johnson's description of her own work.[4]

And based on his observations of Johnson and the results of her work, Papapetrou concludes that

"Johnson performed substantially [] similar duties as I did in 2018."  Papapetrou Decl. ¶ 8.

---

[4] Johnson's complaint catalogs her job responsibilities as follows:

[M]aintaining cost controls for all project related activities, participating in the
development and management of program capital and operating budgets, utilizing the
system to create projects, preparing queries, entering and retrieving information,
producing reports, conducting analysis, entering purchase requisitions, tracking purchase
orders, and validating internal personnel labor and non-personnel costs to include
preparing payment application requests and system-receipts required to pay
vendors/contractors.

Pl.'s Cross-Mot. at 5 (citing Compl. ¶ 21).

While Papapetrou's support of a colleague may be admirable, his declaration does not create a genuine dispute as to whether the two positions are substantially equal. As WMATA notes, having some shared duties and responsibilities does not render the jobs substantially equal. Def.'s Reply at 6; see also Goodrich, 815 F.2d at 1524–25. Moreover, Papapetrou's list of responsibilities is not exhaustive—it is preceded by the statement, "my primary responsibilities *included*"—leaving room for additional tasks. Papapetrou Decl. ¶ 4 (emphasis added). The absence of funding approval from his enumerated list of shared responsibilities only bolsters the conclusion that Johnson's position did not share that duty. Papapetrou may well have observed Johnson performing similar tasks, but his declaration does not establish "substantial equality" in the legal sense meant by the Equal Pay Act.

Johnson also claims that her supervisors' review of her job responsibilities following her formal complaint was cursory, and that they failed to interview Papapetrou or examine his job duties. Pl.'s Cross-Mot. at 5–6. But because Johnson has not offered proof that she was entrusted to approve funding, or rebutted WMATA's evidence that Papapetrou's position required that responsibility, the scope of her position evaluation is beside the point.

Accordingly, Johnson has not made out a prima facie Equal Pay Act case and WMATA is entitled to summary judgment on that claim.

## 2. *WMATA's Affirmative Defense*

Even if Johnson had made out a prima facie case, WMATA would be entitled to summary judgment because it has established the Equal Pay Act's fourth affirmative defense: that the relevant pay differential was "based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Specifically, WMATA has shown that the pay gap resulted from "Papapetrou's

prior work history, salary, experience, and WMATA's policies governing promotions."  Def.'s Reply at 2.

Until he assumed the Project Coordinator role in April 2018, Papapetrou was a Local 2 member and his "salary and raise history" were "governed by a collective bargaining agreement" between WMATA and his union.  Def.'s Mot. at 4 (citing Def.'s SMF ¶¶ 6–10).  The CBA entitled Papapetrou to pay increases over the years, such that by March 2018 his annual salary was $123,422.  Def.'s SMF ¶¶ 8–10, 15 (citing Fletcher Dep. Ex. 4; Fletcher Decl. ¶¶ 6–8).  A WMATA human resource official, Dyane Fletcher, testified that WMATA regarded Papapetrou's new position as a promotion and applied its compensation policy for promoted employees when setting his salary.  Fletcher Dep. 12:6–13:10, 35:21–36:10.  That policy states that promoted employees will "receive the greater of a 10% promotional adjustment" or an "increase to the minimum of the new salary range."  Pl.'s SMF, Ex. L (WMATA Compensation Management and Administration ("WMATA's Compensation Policy") § 5.02(b)(4)(iv)); see also Fletcher Dep. Ex. 4 (spreadsheet entry noting the reason for the new salary as "10% Minimum for Promotion based on Comp Policy").  Papapetrou's salary was already above the minimum of the EG-13 salary range, so WMATA determined that he was entitled to a 10% adjustment under the policy, resulting in an annual salary of $135,764.  See Fletcher Decl. Ex. B; Def.'s SMF ¶ 14 (citing Fletcher Dep. 77:21–79:4; Fletcher Dep. Ex. 4).

Johnson does not dispute that WMATA calculated Papapetrou's new salary by applying a 10% increase over his prior salary under WMATA's promotion policy.  Instead, she argues that the CBA does not address salary determinations when employees move from union to non-union positions and, therefore, the CBA did not require Papapetrou's 10% raise.  See Opp'n at 7–8.  But that argument is a red herring.  WMATA does not contend that the raise was *dictated* by the

CBA; it simply explains how operation of the CBA resulted in Papapetrou's salary as of April 2018.  And it offers undisputed evidence that WMATA increased Papapetrou's then existing salary by 10% under its promotion policy.  Again, Johnson nowhere disputes that WMATA in fact applied the promotion policy to arrive at Papapetrou's Project Coordinator salary.

       Johnson also maintains that the provision of WMATA's compensation policy that dictates a 10% salary increase for promotions, § 5.02(b)(4)(iv), does not apply in cases, like Papapetrou's, where union members move to non-union roles.  Pl.'s Reply at 2 (citing WMATA Compensation Policy, Ex. L).  Johnson points to another provision dealing with that scenario, § 5.05, which states: "Salary adjustments for employees moving from represented to non-represented positions as a result of competitive recruitment must be consistent with the provisions of the applicable Collective Bargaining Agreements."  WMATA Compensation Policy.  But whether WMATA applied the correct provision of its compensation policy is immaterial because Johnson has offered no evidence that WMATA did not apply the promotion policy in good faith, or that it somehow used the policy as a pretext to pay Papapetrou more than her or other women employees performing the same job.  See Davis v. Yellen, No. 08-CV-447 (KBJ), 2021 WL 2566763, at *30 (D.D.C. June 22, 2021) ("mere procedural irregularities are 'not sufficient to establish that [the] defendant's proffered explanation is pretextual absent some actual evidence that [the] defendant acted on a motivation to discriminate against [the] plaintiff based on'" his race.) (citation omitted); see also Fischbach v. D.C. Dep't. of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (the pretext inquiry is not centered on the "correctness or desirability of reasons offered [by defendant] . . . but [on] whether the employer honestly believes in the reasons it offers") (cleaned up).

The provision governing transfers (§ 5.05) does not appear at odds with the provision governing promotions (§ 5.020) in any event.  A 10% salary adjustment mandated by § 5.020 can still be "consistent" with the applicable CBA.  Nothing in the language of § 5.020 indicates that it does not apply to promotions of employees moving from union to non-union roles.

Finally, Johnson complains that WMATA did not develop its affirmative defense based on Papapetrou's historical salary trajectory until late in discovery and that the timing somehow suggests that the explanation is pretextual.  Pl.'s Cross-Mot at 7.  Not so.  While shifting explanations for an employment action can suggest pretext in some cases, see Ajisefinni v. KPMG LLP, 17 F. Supp. 3d 28, 42 (D.D.C. 2014), Johnson offers no evidence to cast doubt on the accuracy or veracity of WMATA's account of how it arrived at Papapetrou's salary.  Moreover, the Court permitted WMATA to re-open discovery to obtain information about how Papapetrou's prior union membership affected the calculation of his new salary.

Accordingly, WMATA has conclusively established that it set Papepetrou's salary "based on a factor other than sex."  It would therefore be entitled to summary judgment even if Johnson had made out a prima facie Equal Pay Act case.

### B.  Title VII

Johnson's Title VII claim also fails for similar reasons.  Title VII makes it unlawful for employers to "discriminate against any individual with respect to [her] compensation . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  As with the Equal Pay Act, to allege wage discrimination under Title VII, a plaintiff must show that she performed work "substantially equal" to that of a comparator (along with proving other prima facie elements).  See Anderson v. Zubieta, 180 F.3d 329, 338 (D.C. Cir. 1999).  Then, under the McDonnell Douglas burden-shifting framework's second prong, the employer must

articulate a legitimate, nondiscriminatory reason for the differential.  See, e.g., Guillen-Perez, 415 F. Supp. 3d at 60.  If the employer establishes its burden, then the plaintiff must provide sufficient proof to allow a reasonable jury to infer that the "employer's proffered reason is merely pretext for discrimination."  Id. at 58.

Johnson fails to make out a prima facie case because, as discussed earlier, the record establishes that her Financial Officer position was not substantially equal to Papapetrou's Project Coordinator position.  Additionally, WMATA has supplied a legitimate, nondiscriminatory reason for the pay disparity—namely, that it set Papapetrou's Project Coordinator salary based on its promotion policy—which Johnson has not rebutted with any evidence that WMATA's stated reason is pretext for intentional discrimination based on either sex or race.

WMATA is therefore entitled to summary judgment on Johnson's Title VII claims as well.

## IV.   Conclusion

For the foregoing reasons, the Court will grant WMATA's motion for summary judgment and deny Johnson's cross-motion for summary judgment.

A separate Order shall accompany this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  September 29, 2022


13